# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:23-CR-00024 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MELAD ABDMARIAM FAHMY | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Now before the court is a motion to suppress evidence submitted by Defendant, Melad Fahmy ("Fahmy").  (Doc. 69.)  He contends that he was not provided a *Miranda* warning before a custodial interrogation in contravention of the Fifth Amendment's self-incrimination clause.  Fahmy also alleges that his statements were not voluntarily made in further violation of the Fifth Amendment.  Accordingly, Fahmy seeks to suppress all statements he made to law enforcement during that interrogation.  For the reasons set forth below, the court will deny Fahmy's motion.

### PROCEDURAL BACKGROUND

On February 1, 2023, a federal grand jury returned an indictment against Fahmy.  (Doc. 1.)  The indictment charges him with one count of attempted enticement and coercion of a minor in violation of 18 U.S.C. § 2422(b).  (*Id.*)  On February 15, 2023, Fahmy pleaded not guilty to the charge.  (Doc. 13.)  The trial of this case is scheduled to begin on February 10, 2025.  (Doc. 63, p. 1.)  Fahmy

timely filed the present motion to suppress along with a brief in support. (Docs. 69 & 70.)  The court convened an evidentiary hearing to address Fahmy's motion on January 23, 2025.  Following the hearing, the government timely submitted a brief dated January 27, 2025.  (Doc. 88.)  Fahmy did not file a reply brief.  His motion is now ripe for review.

## FINDINGS OF FACT

At the evidentiary hearing, Fahmy relied on his own testimony in support of his motion.  The Government offered the testimony of FBI Special Agent George Frank ("Agent Frank") and FBI Special Agent Geoff Ford ("Agent Ford")[1], as well as three exhibits, each of which the court admitted.[2]  The court makes the following findings of fact based on this testimonial and documentary evidence.

On February 10, 2022, the FBI and other law enforcement agencies conducted a sting operation.  The operation's targets were those attempting to solicit prostitution from a fictitious 13-year-old girl through an FBI online covert employee ("OCE") posing as the girl's aunt.  Agents involved in the operation were stationed in two hotel rooms at the Ramada Inn in Lower Paxton Township, Pennsylvania ("Hotel").  One room was used for undercover communications with

---

[1]  Agent Frank and Agent Ford were sequestered during the evidentiary hearing when they were not testifying.

[2] The court refers to the government's exhibits as "Gov't Ex. __."  The exhibits are docketed at Docs. 88-1, 88-2, and 88-3, respectively.

potential suspects.  The other was to be used for the interrogations of suspects that arrived at the Hotel.  Four agents were assigned to the "arrest team," *i.e.*, the team responsible for taking suspects at the Hotel into custody.  Those agents were Agent Ford, Agent Frank, FBI Special Agent Eric Rardain ("Agent Rardain"), and FBI Special Agent Alyssa Alliger ("Agent Alliger").

At some point during the operation, the OCE notified the arrest team that a suspect—later identified as Fahmy—was en route to the Hotel.  At this time, none of the agents on the arrest team knew anything about the suspect.  They planned to identify the suspect at the Hotel based on the individual's possession of a pre-arranged identifying item.

As Fahmy arrived at the Hotel, the arrest team started moving towards the Hotel's lobby from the hotel rooms.  Initially, Fahmy had difficulty locating the hotel room to which the OCE directed him.  Similarly, the arrest team had difficulty identifying Fahmy as the suspect, because he did not arrive with the identifying item.  Fahmy began texting the OCE, stating that he could not find her hotel room.  The arrest team identified Fahmy as the suspect when he began texting the OCE, because they had concurrently asked the OCE to text Fahmy.  Fahmy eventually stepped outside the Hotel to call the OCE, who told him that she would meet him in the lobby.  All of these written and verbal communications between Fahmy and the OCE occurred in English.

When Fahmy returned to the Hotel's lobby, Agents Ford and Rardain made contact with him in the lobby, while Agents Frank and Alliger observed from a distance. Agents Ford and Rardain identified themselves to Fahmy as FBI agents, positioned themselves on either side of him, and placed their hands on his arms. The parties agree that Fahmy was in police custody at this moment of contact. Fahmy then walked with Agents Ford and Rardain towards Agents Frank and Alliger. When they got close to the other two agents, Fahmy attempted to free his arms from the agents and go back towards the Hotel's entrance. A physical altercation ensued during which the agents pushed Fahmy against the wall and eventually took him to the ground in an effort to restrain him. Agents then handcuffed Fahmy behind his back.[3] Fahmy was handcuffed for officer safety and as a matter of standard procedure.

The agents then brought Fahmy to the interrogation hotel room. Agents Ford and Rardain sat next to Fahmy and interrogated him while a few other law enforcement officers intermittently moved in and out of the hotel room. Before questioning Fahmy, Agent Ford presented him an FBI advice-of-rights form (a.k.a., an "FD-395"). It states:

---

[3] Fahmy testified that a physical altercation between himself and law enforcement occurred immediately upon law enforcement making contact with him, rather than after some period of cooperation. Specifically, Fahmy testified that law enforcement threw him on the ground as soon as they walked up to him and without identifying themselves as law enforcement. The court finds Fahmy's testimony incredible, especially given Agent Ford's and Agent Frank's identical recollection of the encounter despite their sequestration during each other's testimony.

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov't Ex. 1.)

The FD-395 also includes a waiver, which suspects can sign to acknowledge the following statement:  "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (*Id.*)  In the signature block of the specific FD-395 presented to Fahmy are the notation "UNABLE TO PHYSICALLY SIGN – RESTRAINED" and Agent Ford's initials.  (*Id.*)  The form is dated "2/10/2022" at "8:50 pm."  (*Id.*)

Fahmy claims that he was never presented with this FD-395 nor verbally given the warnings contained therein.  In fact, he avers in his brief that "the agents completed and signed [the FD-395] on his behalf and without his knowledge, purporting to memorialize his receipt of *Miranda* warnings."  (Doc. 70, pp. 2–3.)  Further, Fahmy testified that the first time he ever learned of *Miranda* warnings

was two or three months before the evidentiary hearing while studying in a prison's law library.

Agent Ford's testimony rebuts Fahmy's. Agent Ford testified that he always carries FD-395 forms with him and that he provides *Miranda* warnings to individuals exclusively using an FD-395. He also testified that it is his practice to read the warnings to suspects while they read silently along. Agent Ford further testified that he followed this practice with Fahmy and that Fahmy agreed to speak with law enforcement after Agent Ford showed and read him the FD-395. Agent Ford testified that Fahmy appeared to pay attention and read the form. Agent Ford explained that he signed the FD-395 for Fahmy due to Fahmy remaining handcuffed because of the earlier physical altercation, which created a concern about officer safety.

Upon consideration of the evidence, the court finds that Agents Ford's testimony is more credible than Fahmy's. First, the court finds credible Agent Ford's testimony that his interaction with Fahmy comported with his long-practiced habit of using an FD-395 form to apprise suspects of their *Miranda* rights and of reading the form to suspects while they read along. Second, two government exhibits corroborate Agent Ford's testimony. The first is Agent Ford's contemporaneous notes, which he took on a single piece of paper during Fahmy's interview. (Gov't Ex. 2.) The top left corner of the paper includes the

notation "8:50p – MIRANDA," clearly corroborating that Fahmy received a

*Miranda* warning at 8:50 p.m. that night.  The second exhibit is Agent Ford's

official summary of Fahmy's interrogation, which he drafted the next day ("FD-

302").  (Gov't Ex. 3.)  Agent Ford's FD-302 states that Fahmy "was advised of his

Miranda rights via FBI form FD-395 at approximately 8:50 p.m."  (*Id.* at 1.)  The

FD-302 provides further corroboration of Agent Ford's testimony:

> FAMHY was allowed to read these rights from the form while they
> were verbally reviewed with him.  FAMHY verbally acknowledged his
> rights and agreed to speak with agents without the presence of an
> attorney.  For the safety of the interviewing agents, FAMHY remained
> restrained throughout the interview.

(*Id.*)

Finally, no evidence suggests Agent Ford had any motivation to fabricate the

information, either on the above-mentioned exhibits or during the evidentiary

hearing.  As the government persuasively argues, it is incredible that Agent Ford

would engage in such severe misconduct in order to obtain incriminating

statements from a person about whom he knew nothing prior to a few minutes

before the interview.  (*See* Doc. 88, p. 28.)  For these reasons, the court discredits

Fahmy's testimony that law enforcement never apprised him of his rights prior to

his interrogation.

After reviewing the FD-395, Fahmy agreed to speak with the agents.[4]  Agent Ford then proceeded to ask Fahmy questions in English.  The questions initially sought basic biographical information.  Fahmy provided the requested information, including his Social Security number, his home address, his telephone number, the fact that he owns a diner, and the fact that he emigrated from Egypt about 13 to 14 years before, which facts were later verified to be accurate.  (*See* Gov't Ex. 2.) Agent Ford then asked Fahmy why he was at the Hotel that night.  Fahmy explained that he had received the OCE's phone number from a patron at his diner earlier that day.  (Gov't Ex. 3, p. 1.)  The patron told Fahmy that the number belonged to "a nice girl."  (*Id.*)  Fahmy contacted the number and arranged to meet the OCE at the Hotel.  (*See id.* at 2.)  Fahmy told agents that he went to the Hotel "'to see how [a] 13-year-old can fuck,' but not to 'actually fuck her.'"  (*See id.*) Fahmy clarified to agents that he was going to notify police if a 13-year-old girl was actually present at the Hotel.  Fahmy provided all of this information to law enforcement in English.  The interrogation ultimately lasted approximately 30

---

[4] Fahmy testified that he was "terrified" during the interrogation and that the agents had aggressive demeanors.  Yet, Fahmy's testimony was conclusory.  He did not specifically explain how the agents behaved aggressively.  The court does not find this vague testimony credible. Instead, the court credits Agent Ford testimony that officers did not have their guns drawn or displayed or make any showing of force during Fahmy's interrogation after he was handcuffed following the physical altercation in the hallway.

minutes.  At no point during the interrogation did Fahmy state he did not understand the questions asked of him.[5]

## DISCUSSION

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. Amend. V.  This right against self-incrimination reflects our commitment to "conducting criminal trials and investigatory proceedings upon a plane of dignity, humanity, and impartiality."  *United States v. White*, 322 U.S. 694, 698 (1944).  It represents a repudiation of the "inquisitorial method" used in the English Star Chamber and ecclesiastical courts, where the accused was put upon an oath and compelled "to answer questions designed to uncover uncharged offenses, without evidence from another source," thus subjecting the accused "to the cruel trilemma of self-accusation, perjury, or contempt."  *Pennsylvania v. Muniz*, 496 U.S. 582, 596 (1990) (quoting *Doe v. United States*, 487 U.S. 201, 212 (1988)).  Instead, "our accusatory system of criminal justice demands that the

---

[5] Fahmy testified that he speaks English with 60 to 70 % proficiency.  As noted by the Government, the initial appearance and arraignment for Fahmy on February 15, 2023 was conducted entirely in English, and Fahmy did not indicate that he had any difficulty understanding the court's questions during that proceeding either directly or through counsel.  Those questions included whether he understood that he was charged in the indictment with a serious offense, that he was entitled to counsel of his own selection or appointed by the court, the nature of the offense and potential penalties, that he had the right to remain silent, and that if he made a statement it could be used against him.  (Doc. 88-4, pp. 2–5.)  Further, the court held a violation hearing on November 9, 2023, and a hearing on Fahmy's motion to reconsider detention on April 23, 2024, both of which were conducted entirely in English, and Fahmy once again did not express lack of understanding or request an interpreter either directly or through counsel in either proceeding.

government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda v. Arizona*, 384 U.S. 436, 460 (1966).

In *Miranda*, the Supreme Court recognized that an "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will" and ability to exercise the right against self-incrimination. *Id.* at 467. Accordingly, the court held that in such circumstances, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* Specifically, prior to custodial interrogations, police "must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if he so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 470). Failure to comply with *Miranda* will render inadmissible any statements made by the suspect in a custodial interrogation. *See, e.g.*, *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999).

The court need not consider the threshold question of whether Fahmy was subject to a custodial interrogation when he made his statements to Agents Ford and Rardain. Such analysis concerns whether the agents were required to apprise

Fahmy of his rights before asking him questions.  Here, it is undisputed that Fahmy was in custody when he was taken to the interrogation hotel room and asked questions.  In any event, Agent Ford fully complied with *Miranda* by reviewing the FD-395 with Fahmy.

The dispositive question, therefore, is whether Fahmy waived his right against self-incrimination during the FBI's interrogation.  Suspects need not explicitly invoke their right to remain silent.  *See Berghuis v. Thompson*, 560 U.S. 370, 382 (2010).  So, too, the mere fact that a suspect made statements after receiving a *Miranda* warning is not enough to establish waiver.  *Id.* at 384.  Rather, an "accused's statement[s] made during a custodial interrogation [are] inadmissible at trial unless the prosecution can establish that the accused "in fact knowingly and voluntarily waived *Miranda* rights' when making the statement[s]."  *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  The government must make a showing of waiver by a preponderance of the evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Thus, the court's inquiry "has two distinct dimensions."  *Berghuis*, 560 U.S. at 382 (quoting *Burbine*, 475 U.S. at 421).  The court must determine whether Fahmy made his statements to law enforcement both voluntarily and knowingly. In doing so, the court must consider the totality of the circumstances, "including the background, experience, and conduct of the suspect, as well as any indicia of

coercion." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999) (internal citation omitted).

Voluntary statements are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382 (quoting *Burbine*, 475 U.S. at 421). Here, there is no credible evidence concerning "traditional indicia of coercion"—such as "the duration and conditions of detention, the attitude of the interrogators, [Fahmy's] physical and mental state, and other pressures"—that would suggest Fahmy's answers to law enforcement's questions were the product of intimidation, coercion, or deception. *Briscoe*, 69 F. Supp. 2d at 741 n.1 (citing *Colorado v. Spring*, 479 U.S. 564, 573–74 (1987)). Instead, the credible evidence shows that Fahmy's interrogation was relatively brief (about thirty minutes), during which time Agents Ford and Rardain were seated with Fahmy in a hotel room and did not act aggressively towards him. Accordingly, Fahmy's decision to answer the agents' questions was entirely his own.

A statement is knowingly made when done so "with a full awareness both of the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." *United States v. Latorre-Cacho*, 637 F. Supp. 3d 232, 246 (M.D. Pa. 2022) (quoting *United States v. Sriyuth*, 98 F.3d 739, 748–49 (3d Cir. 1996)).

Among other considerations, "[a] suspect's language barrier may be a relevant" to this analysis. *Id.*

Several considerations lead the court to conclude that Fahmy's waiver was knowing.  First, it is clear that Fahmy is substantially proficient in reading and speaking English.  He had extensive written and verbal communications with the OCE in English.  Fahmy never stated that he had trouble understanding the agents during his interrogation but, instead, cogently answered their questions in detail, providing information that was later verified to be accurate.  Second, it is clear that Fahmy's proficiency in English sufficiently enabled him to understand his rights as they were verbally explained to him by Agent Ford and as he read them in the FD-395.  Indeed, the language in the FD-395 is plain and easily understandable.  (*See* Gov't Ex. 1.)  Finally, Fahmy acquiesced to Agent Ford signing the FD-395 on his behalf with full understanding of what it said.  (*See* Gov't Ex. 1.)  Such a "written waiver of one's *Miranda* rights is strong proof of the validity of the waiver." *United States v. Adamson*, Criminal Action No. 04-672, 2008 WL 167299, at *5 (E.D. Pa. Jan. 16, 2008).  Accordingly, Fahmy decided not to remain silent, despite fully understanding his rights and the consequences of abandoning them.

## CONCLUSION

The court determines that law enforcement properly advised Fahmy of his right against self-incrimination and that Fahmy nevertheless knowingly and

voluntarily waived that right.  The court will therefore deny Fahmy's motion to suppress.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: January 31, 2025